| | |
|---|---|
| UNITED STATES DISTRICT COURT<br>SOUTHERN DISTRICT OF NEW YORK<br>------------------------------------------------------------- X<br>:<br>IN RE BERNARD L. MADOFF INVESTMENT :<br>SECURITIES LLC :<br>:<br>------------------------------------------------------------- :<br>:<br>THE PUBLIC INSTITUTION FOR SOCIAL :<br>SECURITY, :<br>:<br>                                    Appellant, :<br>:<br>             -against- :<br>:<br>IRVING H. PICARD, :<br>:<br>                                    Appellee. :<br>------------------------------------------------------------- X | USDC SDNY<br>DOCUMENT<br>ELECTRONICALLY FILED<br>DOC #: _____<br>DATE FILED: 9/20/2023<br><br>1:22-cv-8741-GHW<br><br>MEMORANDUM<br>OPINION & ORDER |

GREGORY H. WOODS, United States District Judge:

## I. INTRODUCTION

This case sits at the crossroads of bankruptcy and sovereign immunity. Bankruptcy because it involves attempts by Appellee Irving H. Picard (the "Trustee") to recover investor funds paid out by Bernie Madoff's notorious Ponzi scheme. And sovereign immunity because Appellant The Public Institution for Social Security ("PIFSS") argues that, as a Kuwaiti governmental agency, it cannot be subjected to the jurisdiction of United States courts under the Foreign Sovereign Immunities Act (the "FSIA").

The parties' specific dispute—and PIFSS's appeal in this Court—centers on the bankruptcy court's determination that PIFSS was not entitled to sovereign immunity because of the third clause of the FSIA's "commercial activities" exception. While PIFSS acknowledges that it was engaged in commercial activity, it contends that the "act" at the heart of the Trustee's action claim against it— its receipt of proceeds of Madoff's fraud—did not have an effect on the United States. This is because the redemption request that led to its receipt of funds was directed to a foreign entity that

funded the request out of cash on hand—rather than by requesting funds from Madoff's fund in the United States. Because the Trustee has not shown that PIFSS engaged in an act that had a direct effect in the United States, no exception to FSIA applies, and the bankruptcy court's sovereign-immunity decision is reversed.

## II. BACKGROUND[1]

### a. Procedural History

As noted in this Court's order partially granting PIFSS's motion for leave to appeal, *see* Dkt. No. 14, this case is one of many that have arisen from Bernard Madoff's Ponzi scheme, the details of which are "well documented across many pages of Federal Reporters." *Picard v. Gettinger (In re BLMIS)*, 976 F.3d 184, 188 (2d Cir. 2020). After Madoff's scheme collapsed, the Trustee was appointed to liquidate his fund (Bernard L. Madoff Investment Securities LLC, or "BLMIS"). In that role, the Trustee pursues claims to recover for investor funds paid out by BLMIS.

In January 2012, the Trustee filed this case against PIFSS in the Southern District of New York Bankruptcy Court. JA 1–14. The complaint alleged that PIFSS received several transfers of money from Fairfield Sentry Limited ("Fairfield Sentry"), a British Virgin Islands entity. JA 2 ¶ 2. Those funds, the complaint alleged, were derived from Fairfield Sentry's investments with New York-based BLMIS. JA 2–3 ¶¶ 2, 6. The complaint further alleged that PIFSS "knowingly direct[ed] funds to be invested with . . . BLMIS through Fairfield Sentry." JA 3 ¶ 6; *see also* JA 3 ¶ 2 (alleging that Fairfield Sentry "maintained in excess of 95% of its assets in its BLMIS customer accounts"); JA 3–4 ¶ 7 (alleging that "PIFSS entered into a subscription agreement with Fairfield Sentry under which it submitted to New York jurisdiction"); JA 798–802 (subscription forms between PIFSS and Fairfield Sentry).

---

[1] References to the "JA" are to the joint appendix filed by the parties. *See* Dkt. No. 16. This order focuses on the facts relevant to PIFSS's sovereign-immunity appeal; for a more comprehensive description of the case's facts, readers are referred to the bankruptcy court's underlying order. *See* JA 935–965.

Through the complaint, the Trustee initially pursued two transfers that PIFSS had received from Fairfield Sentry: a $10 million transfer made on April 14, 2003, and a $20 million transfer made on January 21, 2004. *See* JA 12 ¶ 41; JA 204. But in December 2021, the parties stipulated to the dismissal of the Trustee's claim as to the $10 million April 2003 transfer, leaving only the $20 million January 2004 transfer at issue. Dkt. No. 17 ("Appellee's Opp.") at 6 n.2; *see also* JA 803–804 (showing the transfer of $20 million).

In February 2022, PIFSS filed the motion to dismiss that is the subject of this case. JA 92–94. As relevant here, PIFSS argued that it was immune from suit under the FSIA. JA 676–679. But on August 17, 2022, the Bankruptcy Court denied PIFSS's motion. JA 935–965. Judge Cecelia Morris determined—again, as relevant here—that the "commercial activities" exception of the FSIA, 28 U.S.C. § 1605(a)(2), precluded PIFSS's entitlement to sovereign immunity because the Trustee's action was based upon foreign acts undertaken by PIFSS in connection with commercial activity, and those acts had a direct effect in the United States. JA 902–906.

On October 13, 2022, PIFSS timely noticed its intent to seek leave to appeal Judge Morris's sovereign-immunity determination as well as several other rulings that she had issued concerning personal jurisdiction and section 546(e) of the bankruptcy code. Dkt. No. 1. After PIFSS voluntarily withdrew its request to appeal the Section 546(e) issue, *see* Dkt. No. 11 at 1, this Court—on May 5, 2023—partially granted the remainder of PIFSS's motion by permitting appeal on the sovereign immunity issue but denying appeal concerning personal jurisdiction. Dkt. No. 14. In accordance with that order, on May 26, 2023, PIFSS filed its brief appealing Judge Morris's sovereign-immunity ruling. Dkt. No. 15 ("Appellant's Br."). The appeal is fully briefed. Dkt. No. 17; Dkt. No. 18 ("Reply").

### b. Factual Background: The $20 Million Transfer

The Court assumes the reader's familiarity with the record and the Bankruptcy Court's

3

opinion, but several facts regarding the $20 million transfer at issue in this case should be highlighted in order to set the stage for the Court's analysis. First, is the citizenship of the parties involved in the transactions at issue here. PIFSS is an agency of the government of Kuwait. Fairfield Sentry is an entity organized under the laws of the British Virgin Islands. Only New York-based BLMIS was located in the United States.

PIFSS did not invest directly in BLMIS. Instead, it invested in equity securities of Fairfield Sentry. In turn, BLMIS made investments on behalf of Fairfield Sentry. The complaint in the adversary proceeding alleges "upon information and belief" that PIFSS "entered into a subscription agreement with Fairfield Sentry under which it submitted to New York jurisdiction." JA 3 ¶ 7. However, PIFSS argues that in its opposition to the motion to dismiss the adversary complaint, the Trustee "walked back his allegation that PIFSS entered a subscription agreement by claiming that 'PIFSS **likely** would have subsequently signed one.'" Appellant's Br. at 11 (emphasis in the original). And, indeed, in connection with this appeal, no subscription agreements have been presented to the Court.

Instead, the parties have presented to the Court two subscription forms by PIFSS. JA 800–802. The first, dated March 1, 1999, was for the acquisition of shares in Fairfield Sentry valued at $10,000,000. JA 801–802. The second, dated June 16, 1999, was for the acquisition of an additional $5,000,000 in shares. JA 800. A separate confirmation, dated September 22, 2000 related to the acquisition of $15,000,000 in shares. JA 798. That confirmation form directed that the subscription payment be made to a correspondent bank account at HSBC Bank USA located in New York, New York, for further credit to Fairfield Sentry's bank account at Citco Bank Nederland, N.V. in Amsterdam. *Id.*

Fairfield Sentry issued an information memorandum regarding its offering of shares, dated January 1, 1998 (the "Information Memorandum"). JA 763 *et seq.* The Court understands that

information memorandum to have been in effect at the time that PIFSS acquired its shares and that its description of the rights of shareholders applied to the shares owned by PIFSS. As Appellees contend, the Information Memorandum:

> disclosed BLMIS' multiple roles as the *de facto* investment manager, broker-dealer, and custodian for Sentry and highlighted the numerous U.S. connections inherent in investing in Sentry, including: (i) Sentry invested at least 95% of its assets with BLMIS in New York; (ii) New York-based BLMIS was the custodian of Sentry's investments with BLMIS in New York; (iii) any returns on investment in Sentry would purportedly be earned by BLMIS in New York through its execution of the SSC Strategy; (iv) BLMIS' SSC Strategy purportedly involved the purchase and sale of U.S. securities, U.S. options, and U.S. Treasury Bills; and (v) BLMIS performed all investment management duties for Sentry, and the decisions regarding when and which U.S. securities to purportedly purchase were made by BLMIS in New York.

Appellee's Opp. at 6–7. The record supports the conclusion that PIFSS understood that its investment in Sentry would be delivered to BLMIS in New York to be invested using the BLMIS "strategy."

The Information Memorandum also contained a description of the rights of shareholders to redeem their shares in Fairfield Sentry. As a general matter, shareholders were permitted to redeem shares monthly, after notice, at the "Net Asset Value Per Share." JA 783–784. The Information Memorandum made clear that shareholders bore the risk of reductions in the Net Asset Value of their shares. JA 784. And, in addition, Fairfield Sentry reserved the right to "temporarily suspend" any redemption "if the effect of substantial redemptions would seriously impair the Company's ability to operate." *Id.* Redemption forms were attached to the Information Memorandum.

PIFSS made the redemption request that resulted in the $20,000,000 payment to it that is at issue in this case sometime before January 20, 2004 (the "Redemption Request"). The Information Memorandum states that redemption requests had to be received by Fairfield Sentry at least ten business days prior to the redemption date. JA 783. The parties have not presented to the Court the form on which the Redemption Request was made to Fairfield Sentry, however, the Court understands that it is undisputed that the Redemption Request was issued outside of the United

5

States and that it was directed to Fairfield Sentry outside of the United States. The "Redemption Request Form" attached to the Information Memorandum was required to be addressed to Fairfield Sentry Limited c/o Citco Fund Services (Europe) B.V. in Amsterdam. JA 794.

The January 20, 2004 request for the $20,000,000 wire transfer payment from Fairfield Sentry's account was directed to "Citco Bank Nederland N.V., Dublin Branch" in Dublin, Ireland. JA 804. The request directed that the funds be debited from Fairfield Sentry's account abroad. *Id.* According to the wire transfer request, the funds were to be credited first to a JPMorgan Chase bank account in New York, New York, for further credit to PIFSS's bank account at Ahli United Bank (UK) Plc London. *Id.*

The critical fact here is that PIFSS's $20,000,000 redemption on January 20, 2004 did not lead Fairfield Sentry to request money from BLMIS in the United States. At the time of the redemption request, Fairfield Sentry was sitting on a huge amount of cash that was sufficient to permit Fairfield Sentry to fund the redemption request without making a withdrawal from BLMIS. The following chart summarizes the transfers to Fairfield Sentry from BLMIS and from Fairfield Sentry to BLMIS at in the period preceding the PIFSS's redemption.

| Date | Transfer from BLMIS to Sentry | Deposit by Sentry with BLMIS |
|---|---:|---:|
| May 9, 2003 | $40,000,000 | |
| July 11, 2003 | $55,000,000 | |
| July 22, 2003 | $25,000,000 | |
| October 23, 2003 | | $20,000,000 |
| November 14, 2023 | | $50,000,000 |
| January 21, 2004 | | $50,000,000 |
| Totals: | $120,000,000 | $120,000,000 |

Declaration of Leo Muchnik ("Muchnik Decl."), JA 96–112 ¶ 9.

As the chart illustrates, Fairfield Sentry did not request money from BLMIS for the purpose of redeeming PIFSS's shares. That $20 million transfer came roughly six months after the most recent transfers from BLMIS to Fairfield Sentry in July 2003. Also, as the chart illustrates, Fairfield

6

Sentry received funds from third parties sufficient to deposit $120,000,000 with BLMIS between October 2003 and January 21, 2004, after giving effect to PIFSS's redemption request. There is no evidence that PIFSS's redemption request caused Fairfield Sentry to take any action within, or directed at, the United States.

## III.  LEGAL STANDARD

### a. Appellate Jurisdiction and Standard of Review

This Court has jurisdiction over PIFSS's sovereign-immunity-based appeal pursuant to the collateral-order doctrine. *See Petersen Energía Inversora S.A.U. v. Argentine Republic and YPF S.A.*, 895 F.3d 194, 203 (2d Cir. 2018). In considering an appeal over whether an exception to the FSIA applies, this Court "review[s] the [bankruptcy] court's legal conclusions concerning sovereign immunity *de novo* and its factual findings for clear error." *Kensington Int'l Ltd. v. Itoua*, 505 F.3d 147, 153 (2d Cir. 2007).

On a Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction, including one based on a purported entitlement to sovereign immunity, "the Court generally must accept the material factual allegations in the complaint as true," but "does not draw all reasonable inferences in the plaintiff's favor." *Pablo Star Ltd. v. Welsh Gov't*, 378 F. Supp. 3d 300, 306 (S.D.N.Y. 2019). In evaluating such a motion, a court "may refer to evidence outside the pleadings." *Harty v. W. Point Realty, Inc.*, 28 F.4th 435, 441 (2d Cir. 2022) (quoting *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000)); *see also Kensington Int'l*, 505 F.3d at 153 ("In determining whether an exception to the FSIA applies, the district court can and should consider matters outside the pleadings relevant to the issue of jurisdiction."). But "[i]t is only where 'jurisdictional facts are placed in dispute' that the court has the 'obligation to decide issues of fact by reference to evidence outside the pleadings, such as affidavits.'" *Id.* (quoting *Tandon v. Captain's Cove Marina of Bridgeport, Inc.*, 752 F.3d 239, 243 (2d Cir. 2014)). Put differently, "[w]hen the extrinsic evidence submitted by the parties does not

7

controvert the material allegations of the complaint, it is not error for the district court to base its ruling solely on the allegations of the complaint." *Id.*

### b. The Foreign Sovereign Immunities Act

"The FSIA is the sole source for subject matter jurisdiction over any action against a foreign state." *Kensington*, 505 F.3d at 153 (quoting *Cabiri v. Gov't of the Republic of Ghana*, 165 F.3d 193, 196 (2d Cir. 1999)). The statute provides that "a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States except as provided in sections 1605 to 1607 of this chapter." 28 U.S.C. § 1604.

When a defendant alleges that it is entitled to sovereign immunity under the FSIA, it must first "present[ ] a prima facie case that it is a foreign state" within the statute's meaning. *Kensington*, 505 F.3d at 153. "Once the defendant makes that showing, the burden shifts to the plaintiff to make an initial showing that an enumerated exception to sovereign immunity applies." *Pablo Star Ltd. v. Welsh Gov't*, 961 F.3d 555, 560 (2d Cir. 2020). "Determining whether that burden is met involves a review of the allegations in the complaint and any undisputed facts, and resolution by the district court of any disputed issues of fact." *Id.* "Once the plaintiff has met its initial burden of production, the defendant bears the burden of proving, by a preponderance of the evidence, that the alleged exception does not apply." *Id.*

Here, "the parties agree that PIFSS is a foreign sovereign." Appellee's Opp. at 15. As a result, their dispute focuses on whether the Trustee has sufficiently shown that an enumerated exception applies, and whether PIFSS has responded to that showing by proving that such an exception does *not* apply.[2] More specifically, PIFSS contests—and the Trustee defends—Judge

---

[2] Both parties brief these ostensibly two "burden-shifting" steps as essentially one issue—whether or not an exception to the FSIA applies here. The Court agrees that the same facts and legal conclusions demonstrate both that Trustee has met its burden and that PIFSS has not met its burden, and so focuses, like the parties, not on each step of the burden-shifting framework but on the broader question of whether or not an exception the FSIA applies to this case. *See, e.g.*, *Pablo Star*, 961 F.3d at 560–566 (doing the same).

8

Morris's determination that the third clause of the commercial activities exception is applicable to this case. *See* JA 902–906. That clause, which can itself be broken into three prongs, states that

> [a] foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case . . . in which the action is [i] based . . . upon an act outside the territory of the United States [ii] in connection with a commercial activity of the foreign state elsewhere and [iii] that act causes a direct effect in the United States.

28 U.S.C. § 1605(a)(2).[3] Because "PIFSS has never challenged whether [the Trustee] engaged in commercial activity for purposes of the second prong of the commercial activity exception," Reply at 5 n.4, its argument focuses on the first and third prongs to that exception (the "based upon" and "direct effect" prongs, respectively).

In order to determine what "act" an "action" is "based . . . upon," 28 U.S.C. § 1605(a)(2), a court must first "'identify[ ] the particular conduct on which the [plaintiff's] action is based.'" *OBB Personenverkehr AG v. Sachs*, 577 U.S. 27, 33 (2015) (quoting *Saudi Arabia v. Nelson*, 507 U.S. 349, 356 (1993)) (other internal quotations omitted). "[A] court should identify that 'particular conduct' by looking to the 'basis' or 'foundation' for a claim . . . 'those elements . . . that, if proven, would entitle a plaintiff to relief,' . . . and the gravamen of the complaint.'" *Id.* at 33–34 (quoting *Nelson*, 507 U.S. at 357) (other internal quotations omitted).

Under the third clause of the commercial activities exception, the foreign "act" that an action is "based . . . upon" must "cause[ ] a direct effect in the United States." 28 U.S.C. § 1605(a)(2). "[A]n effect is 'direct' if it follows 'as an immediate consequence of the defendant's . . . activity.'" *Guirlando v. T.C. Ziraat Bankasi A.S.*, 602 F.3d 69, 74 (2d Cir. 2010) (quoting *Republic of Argentina v. Weltover*, 504 U.S. 607, 618 (1992)). That said, "[i]n order to be 'direct,' an effect need

---

[3] While Trustee argued in the alternative to the bankruptcy court that the first or second clauses of the commercial activities exception might also permit this claim against PIFSS, *see* JA 732–733, Judge Morris did not rely on either of those clauses in her decision below, *see* JA 902–906, and Trustee did not renew that argument in this Court, *see generally* Appellee's Opp. So this Court focuses, like the parties, on the commercial activity exception's third clause.

9

not be 'substantial' or 'foreseeable.'" *Atlantica Holdings*, 813 F.3d at 108 (quoting *Weltover*, 504 U.S. at 618). Finally, in this Circuit, "the defendant's conduct that is alleged to have had a direct effect in the United States must be legally significant." *Guirlando*, 602 F.3d at 77.

## IV. DISCUSSION

The Bankruptcy Court's decision rested on a faulty assumption. The Bankruptcy Court's analysis was based on its erroneous understanding that "[t]he Defendant and the Trustee *agree* that the gravamen of the Complaint"—that is, the relevant act or acts that the Trustee's action is based upon—"is PIFSS's receipt of funds *due to its subscription into Fairfield Sentry*." JA 904 (emphasis added). As a result of that assumption, the "act" that the Bankruptcy Court considered was the bundle of activities constituting the entirety of PIFSS's engagement with Fairfield Sentry, including its subscription into the fund, as well as its redemption request and receipt of funds. Defining the relevant "act" to include its initial subscription into Fairfield Sentry made it easy for the Bankruptcy Court to conclude that the relevant "act" had a direct effect on the United States. The record supports the conclusion that PIFSS's investment into Fairfield Sentry had an effect on the United States: it resulted in payments to BLMIS for investment on Fairfield Sentry's account.

The Bankruptcy Court's assumption that the parties agreed that the relevant "act" consisted of more than just PIFSS's receipt of funds was not well founded. In both the Bankruptcy Court and this Court, PIFSS has contended that that only PIFSS's receipt of funds from Fairfield Sentry can be considered to be the relevant "act" for FSIA purposes. *See* JA 678 (PIFSS's motion to dismiss briefing in bankruptcy court, arguing that "[t]he gravamen of the Complaint is PIFSS' receipt of funds from [Fairfield] Sentry, a British Virgin Islands entity"); Appellant's Br. at 37 ("[T]he core of the Complaint is PIFSS' receipt of the [$20 million] Transfer. No other conduct is relevant to the based-upon prong." (emphasis removed)). So while PIFSS agrees that its "receipt of funds" from Fairfield Sentry constitutes an act that Trustee's action is based upon, it disagrees that the fact that

10

the receipt was "due to its subscription into Fairfield Sentry" is in any way relevant to the analysis. JA 904; *see also* Appellee's Opp.. at 18 (recognizing that "[t]he parties agree [only] *in part* as to the gravamen of the suit") (emphasis in the original). Because the Bankruptcy Court understood that the parties agreed upon the nature of the relevant "act," it did not consider the issue independently and grapple with the principal challenging fact here: Fairfield Sentry did not request money from the United States to fund PIFSS's redemption request.

The definition of the relevant "act" is dispositive here. There are several possible ways to define the relevant "act" in this case. First, the pertinent "act" could be, as PIFSS argues, solely PIFSS's receipt of funds. Second, the pertinent "act" could also include the redemption request by PIFSS that triggered the payment to it by Fairfield Sentry. Third, the pertinent "act" could be, as the Bankruptcy Court assumed, the entire investment relationship between PIFSS and Fairfield Sentry, including PIFSS's original subscription of shares in and investment into Fairfield Sentry.

If the pertinent "act" is PIFSS's receipt of funds, its redemption of funds, or the combination of the two—the record does not support the conclusion that the act had a direct effect in the United States.[4] Again, as described above, under the commercial activities exception's third

---

[4] PIFSS's position that the pertinent "act" here is merely its receipt of funds is unduly narrow. The Court believes that PIFSS's redemption request as well as its receipt of funds can be properly defined as the pertinent "act." In *OBB Personenverkehr AG*, 577 U.S. at 33 as described above, the Supreme Court started by noting that to "identify[ ] the particular conduct"—the acts—"on which the [plaintiff's] action is based," the court should look "to the 'basis' or 'foundation' for a claim . . . 'those elements . . . that, if proven, would entitle a plaintiff to relief,' . . . and 'the gravamen of the complaint.'" *Id.* at 33–34 (quoting *Nelson*, 507 U.S. at 357) (other internal quotations omitted). PIFSS focuses on *Sachs's* "elements" language. It notes that the Trustee's action here is predicated on 11 U.S.C. § 550(a)(2), which permits a "trustee [to] recover, for the benefit of the estate," an "avoided" transfer "from . . . any immediate or mediate transferee of such initial transferee." It further highlights that the given the elements of section 550(a)(2), all that Trustee must prove to succeed on his claim is "'[(1)] that the [T]ransfer was avoided, and [(2)] that [PIFSS] is an initial or subsequent transferee' of the Transfer." Reply at 14 (quoting *Picard v. Citibank, N.A. (In re Bernard L. Madoff Inv. Secs. LLC)*, 12 F.4th 171, 197 (2d Cir. 2021)). And because only the actual transfer of the $20 million is relevant to those elements, PIFSS argues, the "how, why, and details surrounding PIFSS's receipt of funds"—including the subscription agreement pursuant to which the transfer was made—"are irrelevant," and cannot be considered part of the act that the Trustee's action is based upon. Reply at 14.

While *Sachs* did include language about the elements of a claim being relevant to determining what acts an action is based upon, PIFSS's construction of that language is unduly constrained. The facts and analysis in *Sachs* show as much. There, a plaintiff contended that because she bought a "Eurail" pass from an Austrian railway OBB in the United States, her action against OBB—for negligence, strict liability, and other related torts suffered when she suffered an injury in Innsbruck—was "based upon" the ticket purchase such that OBB's entitlement to sovereign immunity was

11

clause, a foreign state is not immune from actions that are "based . . . upon an act" that is in connection with a foreign state's commercial activity and "*that act* causes a direct effect in the United States." 28 U.S.C. § 1605(a)(2) (emphasis added).

The facts presented to the Court do not support the conclusion that the transfer from Fairfield Sentry to PIFSS—that is, from one foreign entity to another—had any direct effect on the United States. The possibility that the transfer transited through a New York correspondent bank on its way between the foreign bank accounts of two foreign entities does not matter—the brief transit of funds through a U.S. correspondent account is not "legally significant." *Guirlando*, 602 F.3d at 77.

Nor do the facts presented to the Court support the conclusion that the redemption request from PIFSS to Fairfield Sentry had any direct domestic effect. The payments from BLMIS to Fairfield Sentry nearest in time to the January 2004 $20 million transfer occurred in July 2003. Muchnik Decl. ¶ 9. Those BLMIS payments were made five months *prior* to the redemption request that triggered the January 2004 $20 million transfer. Because PIFSS's redemption request to

---

vitiated by the commercial activities exception. *Sachs*, 577 U.S. at 29–30. And the Ninth Circuit agreed with the plaintiff because "the sale of the Eurail pass established a necessary element of each of her claims." *Id.* at 32.

But the Supreme Court unanimously reversed. In doing so, it recognized that the Ninth Circuit had engaged in "an overreading of one part of one sentence in *Nelson*," a predecessor case "in which [the Supreme Court] observed that 'the phrase [based upon] is read most naturally to mean those elements of a claim that, if proven, would entitle a plaintiff to relief under his theory of the case.'" *Sachs*, 577 U.S. at 34 (quoting *Nelson*, 507 U.S. at 357). The Court noted, however, that in *Nelson* it had "not undertake[n] such an exhaustive claim-by-claim, element-by-element analysis of the Nelsons' 16 causes of action." *Id.* "*Nelson* instead teaches," the Court explained, "that an action is 'based upon' the 'particular conduct' that constitutes the 'gravamen' of the suit." *Id.* at 35. And the Court emphasized that "[r]ather than individually analyzing each . . . cause[ ] of action" and the elements within those causes, a court seeking to identify the acts that an action is based upon should "zero[ ] in on the core of [a] suit." *Id.* at 35; *see also Atlantica Holdings v. Sovereign Wealth Fund Samruk-Kazyna JSC*, 813 F.3d 98, 108 (2d Cir. 2016) ("*Sachs* makes clear that in assessing whether an action is "based upon" acts outside the United States, for FSIA purposes, we look not to the analysis of each individual claim, but to the overall question where a lawsuit's *foundation* is geographically based.") (emphasis in the original).

PIFSS's argument that the only relevant "act" here is its receipt of funds, to the exclusion of the request that resulted in its receipt of funds, places excessive emphasis on the "elements" of the Trustee's claim (and whether an act constitutes one of those elements). *Sachs* does not require that result. While *Sachs* repeated *Nelson's* language that "those elements . . . that, if proven, would entitle a plaintiff to relief" could help identify the "particular conduct upon which [a] suit [is] based," *Sachs*, 577 U.S. at 33–34 (quoting *Nelson*, 507 U.S. at 357), the Court shifted its focus—and directed lower courts to shift their focus—to the "gravamen" or "core" of a suit. *Sachs*, 577 U.S. at 35. It is fair to conclude that the redemption request that resulted in the receipt of funds is part of the "gravamen" of the suit here.

Fairfield Sentry in December 2003 occurred *after* BLMIS's most recent payments to Fairfield Sentry, it cannot be the case that PIFSS's redemption request triggered any movement of funds from BLMIS to Fairfield Sentry.  In sum, if the "act" is defined as PIFSS's redemption request or receipt of funds nothing happened in the United States "'as an immediate consequence of the defendant's . . . activity.'"  *Guirlando*, 602 F.3d at 74 (quoting *Weltover*, 504 U.S. 607 at 618) (other internal quotations omitted).  The Trustee has not sufficiently shown that either the redemption request from PIFSS to Fairfield Sentry or the $20 million transfer from Fairfield Sentry to PIFSS had any direct effect on the United States.[5]

Only by defining the relevant "act" to include PIFSS's original investment into the fund several years prior to its redemption can one find on this record an "act" that had a direct effect in the United States.  But the Trustee has disclaimed any argument that the investment activity alone is an appropriate "act."  *See* Dkt. No. 22 ("Oral Argument Tr."), at 21:18–20 ("[Trustee's Counsel]:  "I will concede that, if you find that the redemption isn't sufficient, that the investment activity alone isn't an appropriate act . . . .").[6]  That concession was reasonable given the Second Circuit's

---

[5] These facts also significantly undercut the import of *Securities Investor Protection Corporation v. Bernard L. Madoff Investment Securities LLC*, 480 B.R. 501 (2012) ("*BLI*"), which Judge Morris relied on heavily to find that the third clause of the commercial activities exception applies here.  *See* JA at 905–906.  It is true that *BLI*, in some respects, was similar to this case:  as here, a foreign entity (the Taiwanese Bureau of Labor Insurance, or BLI) subscribed into a Fairfield Sentry fund "with the specific goal of having funds invested in BLMIS in New York, with intent to profit therefrom."  *BLI*, 480 B.R. at 506.  And the *BLI* court did, as Judge Morris noted in this case, hold that BLI's actions "caused a direct effect in the United States by causing a two-way flow of funds to and from New York-based BLMIS."  *Id.* at 513.  But in describing that two-way flow of funds, the *BLI* court noted that when BLI "ma[de] its redemption request, [it] triggered a transfer of over $42 million (including over $2 million in profit) from BLMIS's accounts in New York, through New York banks, finally to BLI abroad."  *Id.*  As noted above, the facts here do not permit a similar conclusion:  because any payment from BLMIS to Fairfield Sentry came before PIFSS's redemption request to Fairfield Sentry, it cannot be that the redemption request "triggered" the movement of money from BLMIS.  So even if, on the facts in *BLI*, the redemption request could be the "act" that the Trustee's action was "based upon" that had a "direct effect" in the United States, that is not true on the pleaded facts here—and so this Court cannot solely rely on *BLI* to resolve the issue.

[6] *See also* Oral Argument Tr. at 21:10–25 ("THE COURT:  In other words, if I don't accept your argument that the redemption had a direct effect on the United States, I have to find that the entry into the subscription agreement and the acquisition of Fairfield Sentry shares and the resulting flow is the act upon which the waiver rests. My question is:  How can I find that in light of the Argentina case and the Saudi Arabia case that the appellants point me to? [Trustee's Counsel]: Well, your Honor, I don't think you can find that. I will concede that, if you find that the redemption isn't sufficient, that the investment activity alone isn't an appropriate act, it will – we're not suing or our claims are not based upon a breach of the subscription agreements between the defendant, PIFFS, and Sentry. This is, as we argued, the redemption and the subscriptions are part and parcel together and the redemption in itself doesn't stand alone.").

13

determination that even in a breach of contract case, one does not consider the parties' entry into the relevant contract as part of the relevant "act," but, instead, the breach alone. *Consulting Concepts Int'l, Inc. v. Kingdom of Saudi Arabia*, No. 21-941-cv, 2022 WL 2236946, at *2 (2d Cir. June 22, 2022) (summary order); *see also Weltover*, 504 U.S. at 620 (concluding that the "rescheduling of the maturity dates" on certain bonds by the Argentine government, rather than the "issuance of" those bonds, was the act that the plaintiff's case was based upon, even though the issuance of the bonds was a predicate to any rescheduling).

As described in footnote 4 above, the Court believes that PIFSS's approach to defining the appropriate "act" is unduly narrow—but the Court declines to rule as a matter of first impression, unprompted by the Trustee, that the relevant "act" in this context should be defined to include PIFSS's initial investment in Fairfield Sentry. Because the other cognizable "acts"—the redemption request and receipt of funds by PIFSS—did not have a direct effect in the United States, PIFSS's motion must be granted.

## V.   CONCLUSION

For the reasons stated above, the bankruptcy court's denial of PIFSS's motion to dismiss based on its purported entitlement to sovereign immunity is reversed and PIFSS's motion is GRANTED.

The Clerk of Court is directed to terminate this appeal and to close this case.

SO ORDERED.

Dated: September 20, 2023
New York, New York

GREGORY H. WOODS
United States District Judge